UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

TARA SCHUTTER,

        Plaintiff,

        v.                               CAUSE NO.: 4:23-CV-93-TLS

FRANCISCAN ALLIANCE, INC.,

        Defendant.

## OPINION AND ORDER

The Plaintiff, Tara Schutter, filed a Complaint [ECF No. 1] against the Defendant, Franciscan Alliance, Inc., alleging that the Defendant discriminated against her based on a disability, a record of a disability, or by regarding her as disabled when she was not selected for the position of Trauma Program Coordinator in 2022.[1] This matter is now before the Court on the Defendant's Motion for Summary Judgment [ECF No. 30]. The Plaintiff filed a Response [ECF No. 33], and the Defendant filed a Reply [ECF No. 38]. As explained below, the Court grants the Defendant's motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an

---

[1] The Complaint also alleges discrimination related to two other positions for which she applied but was not selected—Emergency Room Manager and Clinical Resource Nurse. *See* Compl. ¶¶ 12–14, ECF No. 1. However, in response to summary judgment, the Plaintiff pursues only the claim based on the Trauma Program Coordinator position, abandoning any claim based on the other two positions. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (concluding that a claim was abandoned when a party failed to defend it "in his district court brief in opposition to summary judgment"). The Court grants summary judgment for the Defendant on the abandoned claims.

absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which [she] bears the burden of proof; if [she] fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## MATERIAL FACTS

The Plaintiff, Tara Schutter, began her employment with the Defendant, Franciscan Alliance, Inc., in 2012 as a registered nurse ("RN") in the emergency department ("ED") at the Defendant's hospital in Lafayette, Indiana. Ex. 1, 25:24–26:17, 27:6–14, ECF No. 30-1.[2] The Plaintiff initially worked full-time but later transitioned to PRN, or "as-needed," status in May 2019 because she took a full-time role with another organization as a flight nurse. *Id.* 34:6–13, 35:9–17; Ex 3, ¶ 4, ECF No. 30-3.

---

[2] The Defendant's exhibits are numbered 1–8, ECF Nos. 30-1 through 30-8; the Plaintiff's response exhibits are lettered A–H, K–M, ECF Nos. 35-1 through 35-11; and the Defendant's reply exhibits are numbered 1–5, ECF No. 38-1 through 38-5.

Jessica Corbin served as the hospital's Director of Nursing Operations from August 29, 2021, to April 22, 2023, and has served as the Chief Nursing Officer since April 23, 2023. Ex. 3, ¶ 5, ECF No. 30-3.

The Plaintiff was diagnosed with a rectal fistula, underwent several surgeries to treat it, and was treated by means of a partial proctectomy and temporary loop ileostomy on February 9, 2022. Ex. 1, 117:15–118:13; Ex. B, ¶¶ 2, 3, ECF No. 35-2. She still had the loop ileostomy in place at the time of briefing. Ex. B, ¶ 3.

In December 2021, the Plaintiff applied but was not selected for an Emergency Department Manager position; Ms. Corbin was the decisionmaker. Ex. 3, ¶¶ 6–7. Ms. Corbin was unaware of any medical condition that the Plaintiff may have had at the time of the decision. *Id.* ¶ 9. Ms. Corbin selected Regina Nuseibeh for the position, first on an interim basis as of January 1, 2022, and then on a permanent basis effective March 21, 2022. *Id.* ¶ 8.

On February 1, 2022, the Plaintiff applied for a Clinical Resource Nurse position and was interviewed on February 8, 2022. Ex. 2, ¶ 9, ECF No. 30-2; Ex. 6, ¶ 7, ECF No. 30-6. Ms. Corbin was the final decisionmaker and did not select the Plaintiff. Ex. 3, ¶¶ 10–12. Ms. Nuseibeh sat in on the interview for the position but was not a decisionmaker. Ex. 5, 17:15–25, ECF No. 30-5. Dana Slatton, a Patient Care Coordinator, assisted in the interview. Ex. 6, ¶¶ 4, 5. In her written review, Ms. Slatton rated the Plaintiff 1 out of 3 and commented, "Feel that while Tara could perform this job she will bring a negative energy to the department. She has been counseled regarding her attitude in the past with little sustained changes and in this role that would set a negative culture in the department." *Id.* ¶ 7; *id.* Dep. Ex. A. Several years earlier, when the Plaintiff was a new nurse, Ms. Slatton had a professional counseling conversation with

her about her unprofessional behavior and use of professional language while working. *Id.* ¶ 8; Ex. B, ¶ 4, ECF No. 35-2.

The Plaintiff testified that, early in 2022, both Ms. Nuseibeh and Ms. Corbin learned that she had a rectal fistula, which the Plaintiff describes as a fake passage through the rectal muscle, and was going to have surgery. Ex. 1, 50:12–18, 117:21–118:13. Indeed, on January 23, 2022, the Plaintiff and Ms. Nuseibeh exchanged text messages with Ms. Nuseibeh asking, "You feeling ok? Any word on more surgery?" Ex. A, ECF No. 35-1. The Plaintiff responded, "I'm doing okay. Surgery is set for Feb 9th. I'm having a partial proctectomy and a temporary loop ileostomy." *Id.* Ms. Nuseibeh replied, "Oh my gosh Tara! I'm not sure how you are preparing yourself mentally for this. I remember how difficult post op was for you during your last surgery. Are you ok?" *Id.* Ms. Corbin testified that, either immediately after telling the Plaintiff that she was not selected for the Emergency Department Manager position or immediately after telling the Plaintiff that she was not selected for the Clinical Resource Nurse position, the Plaintiff told Ms. Corbin that she had a fistula and required surgery. Ex. 4, 14:7–21, 15:1–16:16. Thus, Ms. Corbin knew about the Plaintiff's medical condition before the interview for the Trauma Program Coordinator position in May 2022. Ex. L, 51:2–7, ECF No. 35-10.

Ms. Corbin states that she never viewed the Plaintiff as having a disability, was never made aware of any restrictions the Plaintiff had with respect to work, and did not consider her as being limited in performing her then-current role as an RN in the ED or any of the roles for which she applied. Ex. 3, ¶ 14. She did not believe she had reason to check if the Plaintiff had medical restrictions during her employment and did not check to see if she had medical restrictions until the Plaintiff filed her EEOC Charge, leading to this lawsuit and discovery requests. *Id.* ¶ 15. Ms. Corbin states that she does not view, and has never viewed, the positions

the Plaintiff applied for as requiring any more physical activity than the ED RN position she already held, and in fact, the positions she applied for overall had less stringent physical demands than the ED RN position she was already performing. *Id.* ¶ 16. Ms. Corbin never noticed the Plaintiff wearing a colostomy bag and never observed or considered her as having any difficulties in her ability to physically perform her job duties. *Id.* ¶ 17.

On April 23, 2022, the Plaintiff applied for the Trauma Program Coordinator position, which is the basis of her remaining ADA discrimination claim. Ex. 2, ¶ 11. The primary duties of the Trauma Program Coordinator position include responsibility for developing, implementing, and maintaining a cost-effective system of care for trauma patients and their families throughout the continuum of care, co-management of the trauma program in collaboration with the Trauma Medical Director and other directors, and management of the operational, personnel, and financial aspects of the trauma program, among other duties. *Id.* ¶ 12; *id.*, Ex. D (Franciscan_0001538). The "Experience Requirements" listed in the job description include three years each of trauma nursing and emergency nursing and one year each of supervisory experience and project management. *Id.*, Ex. D (Franciscan_0001539). Two years of management experience are preferred. *Id.* The "Certifications, Licensures, or Registry Requirements" lists Registered Nurse (RN) and Trauma Nursing Core Course (TNCC) as required. *Id.* The job description includes a "Mission and Philosophy Statement" as well as the five "Franciscan Values" with bulleted descriptions, which are not listed as required qualifications. *Id.* (Franciscan_0001538–39); Ex. C, 43:6–14, ECF No. 35-3.

Ms. Nuseibeh was responsible for deciding who would be selected for the Trauma Coordinator Position and conducted interviews along with Ms. Corbin and Dr. Francis (an employee of Unity, contracted by Franciscan to be the Program Director for the Trauma

Program) in the second round. Ex. 1, 51:3–6, 52:17–22; Ex. 7, ¶ 5, ECF No. 30-7; Ex. 8, 4:3–16,

ECF No. 30-8. Ms. Nuseibeh made written comments about the first interview with the Plaintiff

on May 12, 2022:

> I have some reservations about this candidate and need a second interview with Dr. Francis, and Jessica Corbin. During interview she provided examples that focused on external barriers. She also provided examples of other nurses/hospital provided care that was of concern but she did not follow up with the nurses/hospital to prevent concerns from happening to another patient. A trauma coordinator will be responsible for ongoing identifying opportunities and working with staff to improve outcomes. Tara did not consider this in her practice per examples she provided.

Ex. 7, ¶¶ 6, 7; *id.*, Aff. Ex. A (Franciscan_0000001). Her other notes from the first interview

included an admission by the Plaintiff that she has no filter but continues to work on her attitude;

a notation that the Trauma Program Coordinator role requires professionalism and emotional

intelligence, which Ms. Nuseibeh felt the Plaintiff had not exercised due to an occasion when the

Plaintiff discussed concerns about care by a provider in front of the staff; and a conclusion that

"[the Plaintiff] has many excellent qualities that would work well in a trauma coordinating

position. There were a few answers she demonstrated not talking with a nurse—rather just fixing

unsafe situation herself. The trauma program focuses on opportunities for improvement—if she

doesn't address—improvement couldn't happen." Ex. 7, Aff. Ex. B (Franciscan_0001710,

0001714, 0001715).

Ms. Nuseibeh rated the Plaintiff 1 out of 3 on her second interview, meaning that she did

not recommend the Plaintiff for the position. *Id.* ¶ 9; *id.*, Aff. Ex. C. Her notes from the second

interview provide that the Plaintiff "had many excellent qualities in trauma care (pre-hospital and

ED) and with certifications," that she "does not have experience in leading a team or the care of

the trauma patient from pre-hospital through rehab," and that "[o]ther candidates have leadership

and care experience." *Id.* ¶ 10; *id.* Aff., Ex. C. Dr. Francis, who participated in the second

interview, thought that the Plaintiff was professional, appeared competent and confident, had a wealth of skills, and appeared to look forward to the job. Ex. K, 51:7–12, ECF No. 35-9.

After completing all the interviews, Ms. Nuseibeh determined that Ebony McLendon "was the most qualified for the Trauma Program Coordinator position based on prior experience, qualifications, and her responses during the interview." Ex. 7, ¶ 11. She scored Ms. McLendon as "3 (out of 3) - Highly Recommended" and wrote, "I would like to offer her a position," as Ms. McLendon displayed great teamwork and had significant experience working in trauma care centers. *Id.* ¶ 12; *id.* Aff. Ex. D. Ms. Nuseibeh testified that Ms. McLendon did not have the TNCC certification at the time of her interview; that at the time of the interviews, Ms. Nuseibeh did not know the TNCC certification was a requirement as the recruiter had done the screening for the qualifications on behalf of Ms. Nuseibeh; that the TNCC certification was something the hospital could offer Ms. McLendon while she was in orientation; and that Ms. Nuseibeh arranged for Ms. McLendon to complete the TNCC certification. Ex. 5, 29:18–31:1; Ex. C, 90:10–18, 91:3–25. Ms. Nuseibeh explains:

> Even though Ms. McLendon did not have the TNCC certification, I deemed her to be more qualified for the position than [the Plaintiff] because of her experience working in trauma care and responses during her interviews, which suggested she would bring energy, passion, and vision, as well as teamwork, combined with the fact her lack of the TNCC certification could be easily remedied, but [the Plaintiff's] failure to display leadership qualities could not be easily remedied.

Ex. 7, ¶ 13.

Ms. Nuseibeh testified that the Plaintiff met the qualification requirements listed in the job description, including the TNCC certification. Ex. C, 28:20–29:1, 41:23–42:5, 90:25–91:2, 91:9–16. Ms. Nuseibeh testified that the Plaintiff had supervisory experience, but she could not recall at her deposition whether Ms. McLendon had supervisory experience. *Id.* 34:19–35:10. Ms. Nuseibeh testified that the Plaintiff had project management experience. *Id.* 37:18–38:3. At

her deposition, Ms. Nuseibeh could not remember what Ms. McLendon's resume listed for management experience, but she remembered that they discussed some projects she had worked on. *Id.* 36:18–23. Ms. Nuseibeh testified that one of the reasons she did not hire the Plaintiff was because of the "Franciscan Values," explaining that the values are critical in a leadership position and that, during her interview, the Plaintiff demonstrated that she did not follow the value of engaging with others with dignity and respect. *Id.* 42:4–15. When asked at deposition if she knew about the Plaintiff's medical condition at the time she made the decision not to hire the Plaintiff for this position, Ms. Nuseibeh testified that she knew the Plaintiff had had procedures but she could not recall at her deposition which procedures she was aware of at the time of the interviews. Ex. 5, 18:5–12.

The Plaintiff believes she was not hired for the Trauma Program Coordinator position because she was regarded as disabled, and she believes she was regarded as disabled because she met the minimum requirements for the position as well as some of the preferred items, was in good standing, had letters of recommendation, and was never given a clear answer as to why she did not get the position. Ex. 1, 57:7–58:1. The Plaintiff testified that, just before her second interview, Dr. Francis, Ms. Corbin, Ms. Nuseibeh, and she talked about her earlier temporary loop ileostomy and partial proctectomy. *Id.* 58:16–18, 60:3–7. They talked about how the Plaintiff was doing and feeling, and she updated them on the surgery. *Id.* 58:19–59:14. The Plaintiff testified that at no point did she state her health would impact her ability to perform the Trauma Program Coordinator role, no one implied that her health would impact performing the role, and no one made any statements to suggest that any upcoming surgeries would cause a problem in the role. *Id.* 60:8–25. At his deposition, Dr. Francis testified that the partial

proctectomy and loop ileostomy would *not* significantly alter the ordinary functioning of the digestive system. Ex. K, 48:5–25.

Ms. McLendon started as the Trauma Program Coordinator on August 1, 2022, but resigned on January 3, 2023, to move out of state. Ex. 7, ¶ 15. As a result, the Defendant again posted the position, Ex. 5, 65:9–21, and on May 17, 2023, the Plaintiff reapplied, Ex. 2, ¶ 14. Ms. Nuseibeh chose not to interview the Plaintiff based on her prior interviews and because, since the prior interviews, the Plaintiff continued to exhibit the same type of behavior since she began her employment; Ms. Nuseibeh recognized that the Plaintiff nevertheless met the requirements of the job description. Ex. 5, 66:1–17, 71:20–72:5.

On June 14, 2023, the Plaintiff met with Ms. Corbin and Ms. Nuseibeh to discuss why she was not selected for the Trauma Program Coordinator position the second time. Ex. 7, ¶ 18. Ms. Nuseibeh told the Plaintiff, "[Y]ou have, no doubt, the qualifications to do the role Tara, you obviously have, there's no doubt that you have that." Ex. B, ¶ 6. She also said, "But . . . again, you do have qualifications. You have a lot of stuff going on, Tara." *Id.* ¶ 7. Ms. Nuseibeh also said that she wanted to see the Plaintiff grow in that area, meaning in her leadership approach, which she believed was deficient. Ex. 5, 92:22–23; Ex. 7, ¶ 20. Ms. Nuseibeh testified that, when she said, "You have a lot of stuff going on," she was referring to the Plaintiff's qualifications and education and denies that it had anything to do with any medical condition the Plaintiff may have had. Ex. 5, 92:1–93:4; Ex. 7, ¶ 21. The Plaintiff understood the comment to be a reference to her disability and her history of treatment for the disability. Ex. B, ¶ 8. But the Plaintiff testified that she did not know what Ms. Nuseibeh meant by the comment and that Ms. Nuseibeh did not state the fact the Plaintiff had "a lot going on" was a reason for not selecting her for the position. Ex. 1, 65:23–66:12, 67:3–7.

Ms. Nuseibeh testified that, while the Plaintiff had the qualifications for the position and an impressive resume, the biggest concern from the interview was her response to the question about whether she would handle differently the prior situation in a staff meeting when she confronted a physician; when the Plaintiff had answered that she would not have handled it differently, that was a red flag. Ex. 5, 85:1–87:4, 88:13–18. The Plaintiff's responses during her interviews the first time she applied for the position told Ms. Nuseibeh that the Plaintiff "was not equipped to work with physicians in a professional, collaborative manner such that she could be a good leader for the trauma program." Ex. 7, ¶ 17.

Ms. Nuseibeh states she never viewed the Plaintiff as having a disability, was never made aware of any restrictions the Plaintiff had with respect to work, and did not consider her as being limited in performing either her then-current role as an RN in the ED or any of the roles for which she applied. *Id.* ¶ 22. Ms. Nuseibeh did not believe she had reason to check to see if the Plaintiff had medical restrictions during her employment and did not check to see if the Plaintiff had medical restrictions until the EEOC Charge, leading to this lawsuit and discovery requests. *Id.* ¶ 23. Ms. Nuseibeh does not view, and has never viewed, the positions the Plaintiff applied for as requiring any more physical activity than the ED RN position she already held, and the positions she applied for overall have less stringent physical demands than the ED RN position the Plaintiff was already performing. *Id.* ¶ 24. Ms. Nuseibeh never noticed the Plaintiff wearing a colostomy bag and never observed or considered her as having any difficulties in her ability to physically perform her job duties. *Id.* ¶ 25.

Ms. Nuseibeh testified that she did not consider a fistula to be a medical condition, which she considers to be a chronic illness; did not consider the Plaintiff as having a medical condition; and was unaware what a partial proctectomy was, as she does not work in that field and had

never worked with patients with rectal fistulas. Ex. 5, 20:1–24:18. She testified that she "didn't look at this in any other way than [the Plaintiff] was having a procedure." *Id.* 24:3–4. She was unaware whether an ileostomy was an inpatient or outpatient procedure. *Id.* 55:10–12. Ms. Nuseibeh testified that she knew the Plaintiff "had [a fistula] and . . . was getting care for it, and that's all I knew, really, other than, like the procedure she was having. I don't know exactly what those procedures mean. I've never looked them up. I've not taken care of patients with them before." *Id.* 57:25–58:12. Ms. Nuseibeh did not "know how many people go with fistulas and have problems versus don't have problems." *Id.* 25:10–12.

The Plaintiff did not inform Ms. Nuseibeh that there was any part of her job as an ED RN that she could not perform either due to her fistula or any related procedure and did not request any accommodations due to her fistula or related problems. Ex. 7, ¶ 26. The Plaintiff testified that she did not take medical leave while employed by the Defendant and did not request accommodations for disability. Ex. 1, 90:21–91:17. The Plaintiff testified that, during her interviews for the positions she applied for, nothing was discussed related to her medical history or surgery. *Id.* 59:15–23.

The Plaintiff received a rating of 2.9 out of 3.0 on her 2020 performance evaluation (Aug. 1, 2019, to July 31, 2020) from her manager, Megan Goodwin, praising her demeanor, energy, compassion, and communication. Ex. D, ECF No. 35-4. For the 2021 performance review (Aug. 1, 2020, to July 31, 2021) by her manager, Jason Linder, she received a rating of "2" and "meets," noting that she is a team player, asks staff if they need help, has a positive attitude, leads by example, is willing to share knowledge with new nurses, and is kind. Ex. E, ECF No. 35-5. Both years, she was rated a "meets" for "Franciscan Values." Exs. D, E. For her 2022 performance review (Aug. 1, 2021, to July 31, 2022) by her manager, Jason Linder, the Plaintiff

11

received a rating of "meets" for Franciscan Values. Ex. F, ECF No. 35-6. The review was

"acknowledged" by both Ms. Nuseibeh and the Plaintiff without comment. *Id.* When asked at her

deposition, the Plaintiff agreed that, in some past performance reviews, there were comments

that she had a negative attitude and that she agreed with the comments at times. Ex. 1, 95:2–12.

The Plaintiff filed her EEOC Charge on September 13, 2022. Ex. H, p. 1, ECF No. 35-8.

Franciscan's position statement to the EEOC, dated December 23, 2022, provided in part:

> . . . [Franciscan] could not possibly have failed to hire or promote [the Plaintiff]
> because of her claimed disability or because [Franciscan] regarded [the Plaintiff]
> as being disabled as [Franciscan] had no knowledge of any medical condition [the
> Plaintiff] claims to have had when it made hiring determinations for these positions.
> [Franciscan] first became aware of the medical condition [the Plaintiff] describes
> in the Charge through a telephone conversation between Ms. Corbin and [the
> Plaintiff] during which Ms. Corbin informed [the Plaintiff] that she had not been
> selected for the Program Coordinator Trauma position. This conversation occurred
> after all interviews had been conducted and all hiring determinations had been made
> for both the Clinical Resource Nurse position and the Program Coordinator Trauma
> position.

*Id.* ¶ 5. When asked, Ms. Corbin had told Human Resources that she did not have knowledge of

the Plaintiff's medical issues until after Ms. Corbin had informed the Plaintiff that she was not

selected for the positions, which Ms. Corbin intended to mean the positions for which she was

the ultimate decisionmaker—the Emergency Department Manager and Clinical Resource Nurse

positions. Reply Ex. 1, ¶¶ 10, 11, ECF No. 38-1. Ms. Corbin was not the ultimate decisionmaker

for the Trauma Program Coordinator position, and Ms. Corbin avers that HR did not ask whether

she had knowledge of the Plaintiff's medical condition before the Trauma Program Coordinator

interview. *Id.* ¶ 12.

The Plaintiff resigned her RN position in the ED with the Defendant in June 2024,

explaining that she was finding it difficult to work both her full-time job and two PRN jobs. Ex.

1, 104:12–106:17; Ex. 1, Dep. Ex. 7.

## ANALYSIS

In 2022, the Plaintiff was working as a registered nurse in the Emergency Department at the Defendant's hospital. In a text message exchange on January 23, 2022, Ms. Nuseibeh, the Emergency Department Manager, learned from the Plaintiff that she was going to have a partial proctectomy and a temporary loop ileostomy on February 9, 2022. On April 23, 2022, the Plaintiff applied for a Trauma Program Coordinator position with the Defendant and interviewed in May 2022. Ms. Nuseibeh, the decisionmaker for the hiring process, chose Ms. McLendon for the position. The Plaintiff's remaining claim in this lawsuit alleges disability discrimination under the Americans with Disabilities Act (ADA) when the Defendant did not choose her for the Trauma Program Coordinator position in 2022.[3] The Defendant contends it did not choose the Plaintiff for the position because Ms. McLendon was the better qualified candidate.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To succeed on a disability discrimination claim, a plaintiff must prove "that: (1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d

---

[3] In her response brief, the Plaintiff attempts to improperly expand the scope of her Complaint to include not being selected a second time for the Trauma Program Coordinator position in June 2023. The Plaintiff's EEOC charge, filed on September 13, 2022, could not have included this future alleged instance of discrimination, and the Plaintiff did not file a second EEOC charge. Therefore, the Plaintiff has not exhausted her administrative remedies, and the claim is not before the Court. *See Cheek v. W. and S. Life Ins.*, 31 F.3d 497, 500 (7th Cir. 1994) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." (citing *Alexander v. Garnder-Denver Co.*, 415 U.S. 36, 47 (1974))).

994, 996 (7th Cir. 2020) (citation omitted).[4] A failure to promote constitutes an adverse employment action. *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

In its summary judgment motion, the Defendant challenges the third element, arguing that the Plaintiff cannot prove causation because no reasonable juror could conclude that the Plaintiff's medical issue was a determining factor in the decision not to hire her as Trauma Program Coordinator. The Plaintiff resists summary judgment by relying on both the familiar *McDonnell Douglas* burden shifting framework as well as asking the Court to consider the evidence as a whole under *Ortiz. See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 997 (7th Cir. 2020). The Court considers each basis in turn.

## A.    *McDonnell Douglas* **Burden Shifting Framework**

To survive summary judgment on her ADA claim for discriminatory failure to promote using the *McDonnell Douglas* burden shifting framework, the Plaintiff must first demonstrate a prima facie case of discrimination by showing (1) she was disabled within the meaning of the ADA; (2) she applied for and was qualified for the position; (3) she was rejected for the position; and (4) the candidate who was promoted was outside the protected class and had similar or lesser qualifications. *See Conley v. Village of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (citation

---

[4] In its opening brief, the Defendant cites this "but-for" test for the causation element. In *Serwatka v. Rockwell Automation Inc.*, the Seventh Circuit Court of Appeals considered the pre-2008 amendment version of § 12112(a), which prohibited discrimination against a qualified individual with a disability "because of the disability" rather than the current "on the basis of disability," and held that, unlike other federal employment discrimination statutes authorizing a "mixed-motive" analysis, the ADA requires a "but-for" causation analysis in disparate treatment claims. 591 F.3d 957, 961 (7th Cir. 2010). In light of the 2008 amendment to the ADA, the Seventh Circuit has commented that "[i]t is an open question whether the but-for standard . . . announced in *Serwatka* survived the amendment to the ADA." *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015). Nevertheless, other district courts continue to apply the but-for standard, and the Court will do the same here. *See Dillard v. Depaul Univ.*, No. 20-CV-7760, 2026 WL 309657, at *11 (N.D. Ill. Feb. 5, 2026) (citing cases). The Plaintiff does not object to the application of this standard.

omitted); *Ford*, 942 F.3d at 858; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). If the elements are satisfied, the Defendant must then articulate a legitimate, nondiscriminatory reason for its decision. *Ford*, 942 F.3d at 858. If the Defendant meets this requirement, the burden shifts back to the Plaintiff to offer evidence that the stated reason for the decision is a pretext for discrimination. *Id.*

Here, the disputed fourth element of the prima facie case is whether Ms. McLendon, who was chosen for the Trauma Program Coordinator position over the Plaintiff, had similar or lesser qualifications. Focusing solely on the objective qualification of the TNCC certification listed in the job description, the Plaintiff argues that Ms. McLendon was objectively not qualified for the position because she did not have the required TNCC certification but that the Plaintiff was qualified for the position because she satisfied all the required qualifications, including the TNCC certification. Ms. Corbin, the hospital's Chief Nursing Officer, agreed at her deposition that the Plaintiff was objectively more qualified than Ms. McLendon at the time of the interviews based on the TNCC certification requirement. However, the undisputed evidence of record is that the Defendant allows the TNCC certification to be obtained during training and that Ms. Nuseibeh arranged to have Ms. McLendon complete the certification. Thus, as to the objective qualifications, the Plaintiff and Ms. McLendon were effectively similarly qualified.

More importantly, the Plaintiff's singular focus on the objective TNCC certification requirement ignores the subjective qualifications for the position and the undisputed testimony of Ms. Nuseibeh, the decisionmaker, that she felt Ms. McLendon was most qualified for the position based on experience, qualifications, and interview responses. As argued by the Defendant, the Seventh Circuit has "squarely rejected similar attacks on employers' use of 'subjective' criteria, and stated that nothing in [the statute] prohibits employers from relying on

such criteria when promoting individuals." *Armstrong v. City of Milwaukee*, 204 F. App'x 559,

563 (7th Cir. 2006) (quoting *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005); *Millbrook*

*v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) ("[A] court's role is to prevent unlawful hiring

practices, not to act as a super personnel department that second-guesses employers' business

judgments." (cleaned up))). "[S]ubjective evaluations of a job candidate are often critical to the

decisionmaking process . . . ." *Millbrook*, 280 F.3d at 1176.

      Here, the job description begins with a "General Summary," a "Mission and Philosophy

Statement," a detailed listing of the "Franciscan Values," and eleven "Essential Job

Functions/Competencies." The "Certifications, Licensures or Registry Requirements" section

lists four items, two of which are required—RN and TNCC. The listed "Educational

Requirements" are not at issue. The last heading of the job description is "Experience

Requirement." Under the subheading of "Specialization," three years of trauma nursing, one year

of "supervisory," one year of project management, and three years of emergency nursing are

required and two years of management is preferred. That list is followed by a descriptive list of

forty categories of "Required Knowledge, Skills and Ability," which include adaptability,

convincing others, team coordination, verbal and written communication, coaching, composure,

conflict management, and skills teaching.

      After the Plaintiff's first interview for the position, Ms. Nuseibeh's contemporaneous

written comments were that she had "some reservations" and needed a second interview, noting

the Plaintiff gave examples that focused on external barriers. Ms. Nuseibeh also noted the

Plaintiff provided examples of other nurses or the hospital providing care that was of concern but

that the Plaintiff corrected the problem without following up with the nurse or hospital to prevent

the same from happening again. Ms. Nuseibeh wrote, "A trauma coordinator will be responsible

for ongoing identifying opportunities and working with staff to improve outcomes. [The Plaintiff] did not consider this in her practice per examples she provided." Ms. Nuseibeh also noted during the first interview that the Plaintiff admitted she "has no filter" but that she continues to work on her attitude. She further noted that the Trauma Program Coordinator role requires professionalism and emotional intelligence, which she felt the Plaintiff had not exercised on an occasion when she discussed concerns about a provider in front of staff.

After the second interview, Ms. Nuseibeh gave the Plaintiff a score of 1 out of 3, meaning she did not recommend her for the position. Ms. Nuseibeh noted at the time that the Plaintiff "does not have experience in leading a team or the care of the trauma patient from pre-hospital through rehab" and that "[o]ther candidates have leadership and care experience." Ms. Nuseibeh recommended Ms. McLendon for the position with a score of 3 out of 3 because she displayed great teamwork and had significant experience working in trauma care centers. Ms. Nuseibeh wrote that Ms. McLendon was the most qualified applicant based on her experience, qualifications, and responses during the interview. In her affidavit, Ms. Nuseibeh explained that, although Ms. McLendon did not have the TNCC certification at the time of the interview, Ms. McLendon was able to obtain the certification before starting the position. And Ms. McLendon's experience working in trauma care and her interview responses suggested she would bring energy, passion, vision, and teamwork to the role, while the Plaintiff had failed to display leadership qualities in certain circumstances.

The Plaintiff attempts to discredit Ms. Nuseibeh's reasoning by arguing that the Plaintiff had supervisory experience and project management experience and that Ms. Nuseibeh testified she did not know whether Ms. McLendon had supervisory experience or whether Ms. McLendon's resume listed project management experience. But the full testimony shows that

17

Ms. Nuseibeh did not remember *at the time of her deposition* whether Ms. McLendon had the supervisory experience and did remember Ms. McLendon giving examples of project management experience at her interview. The Plaintiff offers no evidence that Ms. McLendon did not have the required and preferred experience, and the Plaintiff does not dispute Ms. Nuseibeh's statement that the Plaintiff did not have experience in leading a team or the care of the trauma patient from pre-hospital through rehab. In the pretext analysis below, the Court addresses, and finds not persuasive, the Plaintiff's argument that Ms. Nuseibeh fabricated her reasons for not selecting the Plaintiff.

Because the Plaintiff considers only the objective qualifications, which were functionally equal, and does not address the subjective qualifications for the position, which Ms. Nuseibeh found favored Ms. McLendon, the Plaintiff has not shown that Ms. McLendon had similar or lesser qualifications. *See Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001) ("It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation." (citation omitted)), quoted in *Millbrook*, 280 F.3d at 1176. As a result, the Plaintiff cannot make out the prima facie case of disability discrimination.

But even if the Plaintiff could make out a prima facie case, she has not shown that the Defendant's articulated legitimate, nondiscriminatory reason for not promoting her was a pretext for discrimination. As discussed above, the Defendant asserts that it hired Ms. McLendon for the Trauma Program Coordinator position instead of the Plaintiff because Ms. McLendon was more qualified overall. *Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025) ("An employer's genuine belief that another candidate's vision for the organization or skillset makes them better suited for the job is a legitimate, nondiscriminatory hiring rationale." (citations omitted)).

18

As the Defendant has met its burden of production, the burden shifts to the Plaintiff to offer evidence that this reason is a pretext for discrimination. "To say that an employer's justification is a pretext means to say that it is a lie, specifically a phony reason for some action." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (quoting *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 646 (7th Cir. 2023)). The question is "whether the employer honestly believed the reason it has offered to explain the [adverse employment decision]," and the Court does not consider "whether the employer's stated reason was inaccurate or unfair." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (citation omitted). As noted above in the context of subjective qualifications, a court is not a "super personnel department that second-guesses employers' business judgments." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (quoting *Millbrook*, 280 F.3d at 1181). To survive summary judgment by showing pretext, the Plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy*, 140 F.4th at 914 (cleaned up).

First, the Plaintiff disagrees with Ms. Nuseibeh's reasons for not promoting her to the Trauma Program Coordinator position. The Plaintiff notes that Dr. Francis reflected, following her second interview, that the Plaintiff was professional, appeared competent, was confident, had a wealth of skills, and appeared to look forward to the job. The Plaintiff also argues that it was a meritless criticism for Ms. Nuseibeh to note that the Plaintiff corrected another nurse's mistake without communicating with the nurse to prevent the same mistake again. But this is simply a disagreement about the subjective qualities Ms. Nuseibeh found important. The Plaintiff does not deny that the event with the nurse occurred, nor has she shown that Ms. Nuseibeh did not honestly believe her given reasons. *See Brooks*, 39 F.4th at 436 ("Arguing about the accuracy of

19

the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." (cleaned up)); *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) ("[A]n employee's own subjective belief that she is as qualified or more qualified than another applicant is insufficient." (citation omitted)).

Second, the Plaintiff argues that Ms. Nuseibeh's criticism that the Plaintiff "has no filter" is meritless. Except that the Plaintniff conceded at her interview that she has no filter and that she continues to work on her attitude. Contrary to the Plaintiff's suggestion, the fact that she met the objective job requirements does not negate Ms. Nuseibeh's observations regarding subjective qualities. Nor do the two previous generally positive annual performance reviews of the Plaintiff as an RN given by the Plaintiff's supervisors, Megan Goodwin and Jason Linder, negate Ms. Nuseibeh's observations when considering the Plaintiff for a promotion to the Trauma Program Coordinator position. There is no evidence that Ms. Nuseibeh was involved in completing those annual performance reviews.

Third, the Plaintiff argues that a reasonable factfinder could infer that Ms. Nuseibeh held the Plaintiff's surgery against her because the Defendant, Ms. Corbin, and Ms. Nuseibeh lied about knowing of her "disability" in the Defendant's December 2022 EEOC position statement. As noted above, the Defendant's position statement claimed that Franciscan "could not possibly have failed to hire or promote [the Plaintiff] because of her claimed disability or because [the Defendant] regarded [the Plaintiff] as being disabled as [the Defendant] had no knowledge of any medical condition [the Plaintiff] claims to have had when it made hiring determinations for these positions."

On its face, the EEOC statement is contrary to the evidence of record that both Ms. Nuseibeh and Ms. Corbin knew about the Plaintiff's fistula and February 9, 2022 procedures prior to interviewing her for the Trauma Planning Coordinator position in May 2022. Indeed, the January 23, 2022 text messages show Ms. Nuseibeh inquiring of the Plaintiff whether she knew if she would have more surgery, the Plaintiff telling Ms. Nuseibeh that she would be having a partial proctectomy and a temporary loop ileostomy on February 9, 2022, and Ms. Nuseibeh responding, "Oh my gosh Tara! I'm not sure how you are preparing yourself mentally for this. I remember how difficult post op was for you during your last surgery. Are you ok?" Ms. Corbin testified that, after notifying the Plaintiff she was not selected for one of the two other positions she had earlier applied for, the Plaintiff told her that she had a fistula and required surgery. And, before the Plaintiff's interview for the Trauma Program Coordinator position in May 2022, the Plaintiff, Dr. Francis, Ms. Corbin, and Ms. Nuseibeh discussed the medical treatment the Plaintiff had undergone in February.

But when viewed in context, the Court finds that there no reasonable inference of dishonesty to be drawn. It appears that, at the time the December 2022 EEOC position statement was written, the Plaintiff was asserting discrimination for not being selected for the Clinical Resource Nurse position and the Trauma Program Coordinator position as those are the two positions referenced in the Defendant's EEOC position statement. *See* Ex. H, ¶¶ 3, 4. The Complaint in this case also includes the Plaintiff's earlier application for the Emergency Department Manager position. Ms. Corbin was the decisionmaker for both the Emergency Department Manager position and the Clinical Resource Nurse position, which was not referenced in the EEOC position statement. The EEOC position statement explains that the Defendant "first became aware of the medical condition [the Plaintiff] describes in the charge

through a telephone conversation between Ms. Corbin and [the Plaintiff] during which Ms.

Corbin informed [the Plaintiff] that she had not been selected for the Program Coordinator

Trauma position." *Id.* ¶ 5. However, the human resources department had this incorrect belief at

the time because Ms. Corbin told HR *she* did not know about the Plaintiff's medical issues until

after Ms. Corbin had informed the Plaintiff that she was not selected for the positions, which Ms.

Corbin intended to mean the positions for which she was the ultimate decisionmaker—

Emergency Department Manager and Clinical Resource Nurse. Reply Ex. 1, ¶¶ 10, 11, ECF No.

38-1. Ms. Corbin was not the ultimate decisionmaker for the Trauma Program Coordinator

position, and Ms. Corbin avers that HR did not ask whether she knew of the Plaintiff's medical

condition before interviewing her for the Trauma Program Coordinator position. *Id.* ¶ 12. There

is no reference in the EEOC position statement to Ms. Nuseibeh's knowledge at the time she

made the decision to hire Ms. McLendon for the Trauma Program Coordinator position. While

the EEOC position statement contains this error, there is no evidence from which it can be

inferred that it was a lie.

    Although both Ms. Corbin and Ms. Nuseibeh knew at the time of the Plaintiff's

interviews for the Trauma Program Coordinator position in May 2022 that the Plaintiff had a

fistula and had had surgery on February 9, 2022, both have stated under oath that they never

viewed the Plaintiff as having a disability, were never made aware of any restrictions the

Plaintiff had with respect to work, and did not consider her as being limited in any way from

performing her then-current role as an RN in the ED or any of the roles for which she applied.[5]

They did not believe they had reason to check to see if the Plaintiff had medical restrictions

---

[5] Although the Defendant argues in the context of causation that Ms. Nuseibeh did not regard the Plaintiff as disabled, the Defendant has not moved for summary judgment on the "disabled within the meaning of the ADA" element of the claim.

during her employment and did not check to see if she had medical restrictions until the Plaintiff

filed her EEOC Charge that led to this lawsuit and information was being requested in discovery.

They also do not view, and have never viewed, the positions the Plaintiff applied for as requiring

any more physical activity than the ED RN position she already held, and in fact, the positions

she applied for overall had less stringent physical demands than the ED RN position that she was

already performing. They never noticed the Plaintiff wearing a colostomy bag and never

observed or considered her as having any difficulties in her ability to physically perform her job

duties. The Plaintiff offers no evidence to the contrary.

The Plaintiff questions Ms. Nuseibeh's testimony that she did not know whether the

Plaintiff's surgery was a "medical condition," finding the statement incredulous because Ms.

Nuseibeh had been a nurse for thirty-five years. The Plaintiff argues that, "[i]f it was not obvious

to Nuseibeh what [the Plaintiff's medical condition] was or how serious it was, all she had to do

was type the phrase into any search engine on the internet . . . ." Pl. Resp. 9, ECF No. 33. But

Ms. Nuseibeh testified that she "didn't look at [it] any way other than [the Plaintiff] was having a

procedure." And as discussed above, Ms. Nuseibeh had no other indication from the Plaintiff

directly or by observation as to any effect her surgery would have on her health or ability to

work. While the Plaintiff accurately states that Ms. Nuseibeh knew as of January 23, 2022, that

the Plaintiff "was going to have a surgical procedure which was the latest in a series of surgeries

that in the past had been difficult for her," the Plaintiff misstates the record in the following

sentence, contending that Ms. Nuseibeh "knew that [the Plaintiff] had a condition which

significantly restricted the normal functioning of her digestive system." *Id.* There is no evidence

that Ms. Nuseibeh knew about the procedures' effect on the functioning of the digestive system.

*See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000) ("It is not enough for

[the plaintiff] to show that [the employer] was aware of [her] impairment; instead [the plaintiff] must show that [the employer] knew of the impairment and believed that [she] was substantially limited because of it." (citation omitted)). In fact, Dr. Francis testified that the partial proctectomy and loop ileostomy would *not* significantly alter the ordinary functioning of the digestive system.

Next, the Plaintiff contends that a factfinder could infer pretext from Ms. Nuseibeh hiring Ms. McLendon, whom the Plaintiff again describes as objectively not qualified because Ms. McLendon did not have the TNCC certification at the time of her interview. As discussed above, the TNCC certification could be obtained during training, and Ms. Nuseibeh found Ms. McLendon to be overall more qualified, when considering both objective and subjective factors. In the absence of evidence "that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext . . . ." *Millbrook*, 280 F.3d at 1176 (citations omitted); *see Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838–39 (7th Cir. 2009) (recognizing that the employer's honest belief that another person was better qualified was a legitimate nondiscriminatory hiring rationale). There is no such evidence in this case.

Next, the Plaintiff points to a comment Ms. Nuseibeh made over a year later, in June 2023, after the Plaintiff applied but was not interviewed for the Trauma Program Coordinator position following Ms. McLendon's departure. At a meeting between the Plaintiff, Ms. Nuseibeh, and Ms. Corbin on June 14, 2023, regarding why the Plaintiff was not considered for the position the second time, Ms. Nuseibeh told the Plaintiff, "But . . . again, you do have qualifications, you have a lot of stuff going on, Tara." The Plaintiff understood this to be a reference to her ongoing health issues. In the conversation, Ms. Nuseibeh was discussing the

24

Plaintiff's qualifications for the position, reinforcing that the Plaintiff had many qualifications and education, but that Ms. Nuseibeh wanted the Plaintiff to grow in her leadership approach. In her affidavit, Ms. Nuseibeh contends that she intended the statement as a compliment about the Plaintiff's qualifications and a recap of the reasons Ms. Nuseibeh did not select her the second time. And the Plaintiff testified that "having a lot going on" was not one of the reasons given for her not getting the position the second time and that she did not know what Ms. Nuseibeh meant by the comment. Notably, the statement was made over a year after the Plaintiff was not selected for the Trauma Program Coordinator position the first time and sixteen months after the Plaintiff's surgery on February 9, 2022. There is no reference in the conversation to any health concern of the Plaintiff, and there is no evidence that Ms. Nuseibeh knew of any further health issues of the Plaintiff after the February 9, 2022 surgery. Contrary to the Plaintiff's assertion, it is not a reasonable inference that the "you have a lot of stuff going on" comment in June 2023 was a reference to the Plaintiff's health in May 2022. *See Castetter*, 953 F.3d at 997 ("[I]solated comments must be contemporaneous with termination or causally relate to the termination process in order to be probative of discrimination." (citation omitted)).

Finally, the Plaintiff criticizes Ms. Nuseibeh's testimony that one of the reasons she did not hire the Plaintiff was because of the "Franciscan Values." The Plaintiff argues that the references to Franciscan Values and emotional intelligence are a thinly veiled pretext for discriminatory motive because Franciscan Values are not listed as "required" for the position. This argument is not well taken as the Franciscan Values are listed on the job description and are relevant to the subjective qualifications discussed above. The Plaintiff also argues that Ms. Nuseibeh did not previously complain about her lack of Franciscan Values, noting that the Plaintiff had received a rating of "meets" for Franciscan Values on her 2022 Annual Review and

stating that Ms. Nuseibeh gave the rating. Pl. Resp. 11. This is inaccurate. The review was completed by the Plaintiff's Manager, Jason Linder, and was only "acknowledged" by both Ms. Nuseibeh and the Plaintiff without comment. It is not evidence of dishonesty that Mr. Linder rated the Plaintiff as "meets" for Franciscan Values yet Ms. Nuseibeh felt the Plaintiff needed to work on those values.

The Plaintiff has not offered evidence to demonstrate that Ms. Nuseibeh's belief that Ms. McLendon was the more qualified candidate was dishonest such that it was a pretext for discrimination based on any disability, medical condition, or surgical procedures of the Plaintiff. The Plaintiff's ADA claim does not survive under the *McDonnell Douglas* burden shifting test.

## B. *Ortiz*: The Evidence as a Whole

A plaintiff can also withstand summary judgment by showing that the evidence, when "considered as a whole," "would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The Plaintiff argues that she has produced sufficient evidence by which a reasonable jury could conclude that the Defendant did not select her for the Trauma Program Coordinator position because decisionmakers knew she had a rectal fistula and corrective surgery in February 2022. She reasons that the timing is suspicious because she was passed over for Ms. McLendon, whom she describes as an objectively less qualified candidate, several months after her surgery. She reiterates that the Defendant was dishonest in its EEOC position statement and cites Ms. Nuseibeh's statement over a year later in June 2023 that the Plaintiff "has a lot going on" in relation to the second time she applied for the position. For all the reasons discussed above in the context of the *McDonnell Douglas* burden shifting test, none of these facts would permit a

26

reasonable juror to conclude that the Plaintiff was not chosen for the Trauma Program

Coordinator position because the decisionmakers knew of her fistula and surgery in February

2022. Accordingly, the Plaintiff also cannot survive summary judgment when considering the

evidence as a whole.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for

Summary Judgment [ECF No. 30]. There being no claims remaining between any parties, the

Court DIRECTS the Clerk of Court to ENTER FINAL JUDGMENT stating:

> Final judgment is entered in favor of the Defendant Franciscan Alliance, Inc. and
> against the Plaintiff Tara Schutter, who takes nothing by her Complaint.

SO ORDERED on February 26, 2026.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT